UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 16-20683-CIV-MORENO**

HERON DEVELOPMENT CORPORATION, a
foreign corporation, and PALACE RESORTS,
S.A. de C.V., a foreign corporation,

          Plaintiffs,

vs.

VACATION TOURS, INC., MEDIA
INSIGHT GROUP, INC., ROSANNA M.
MENDEZ, and GEORGE A. ALVAREZ,

          Defendants.

_____/

## ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

This is an intellectual property case involving alleged violations of The Lanham Act, Florida's Registration and Protection of Trademarks Act, and Florida's Deceptive and Unfair Trade Practices Act. The two Plaintiffs—the owner and the exclusive licensee of certain hotel- and resort-related trademarks—contend that Defendants infringed those trademarks by registering and transacting business on domain names strikingly similar to the protected marks. Plaintiffs filed a seven-count Verified Second Amended Complaint challenging Defendants' conduct.

Plaintiff Palace Resorts, S.A. de C.V. moves for summary judgment on its claim in Count I that Defendants' registration and use of certain domain names violated the Anti-Cybersquatting Consumer Protection Act. *See* 15 U.S.C. § 1125(d). The Court finds that Palace Resorts has carried its burden of proof and is entitled to judgment as a matter of law on this claim. Accordingly, it is ADJUDGED that Palace Resorts' motion for summary judgment on Count I is GRANTED.

## I. Background

### A. Parties and Relevant Non-Parties

#### 1. Relevant Non-Party

##### a. Palace Holding, S.A. de C.V. ("Palace Holdings")

Palace Holdings is a Mexican corporation in the hospitality industry. It owns and operates hotels, resorts, and spas, and sells wedding, meeting, and vacation packages. Although not a party to this case, it has conducted business with Plaintiff and Defendants at various times. Defendant Vacation Tours, Inc. previously had a wholesaler relationship with Palace Holdings until Palace Holdings terminated the agreement in 2014. Palace Holdings previously licensed the trademarks at issue in this case to Heron. However, in February 2016, Palace Holdings assigned those trademarks and the licensing agreement to Palace Resorts, S.A. de C.V.

#### 2. Plaintiffs

##### a. Palace Resorts, S.A. de C.V. ("Palace Resorts")

Palace Resorts is a Mexican corporation in the hospitality industry. It owns and operates hotels, resorts, and spas, and sells wedding, meeting, and vacation packages. Heron currently holds the exclusive license to use, enforce, and protect certain Palace Resorts trademarks in the United States.

##### b. Heron Development Corporation

Heron is a Panamanian company with its principal place of business in Panama City, Panama. It is a wholesale commercial retailer of unsold resort inventory for resorts in Mexico and the Caribbean, including the following properties owned by Palace Resorts:

    (1)    Beach Palace – located in Cancun, Mexico (opened October 1985);

    (2)    Cozumel Palace – located in Cozumel, Mexico (opened in May 2005);

    (3)    Isla Mujeres Palace – located in Isla Mujeres, Mexico (opened in January 2007);

(4)     Le Blanc Spa Resort – located in Cancun, Mexico (opened in August 2005);

(5)     Moon Palace Gold & Spa Resort – located in Cancun, Mexico (opened January 1997);

(6)     Moon Palace Jamaica Grand – located in Ocho Rios, Jamaica (opened in June 2015);

(7)     Playacar Palace – located in Playa del Carmen, Mexico (opened in December 2005); and

(8)     Sun Palace – located in Cancun, Mexico (opened in December 1990).

Heron and Palace Holdings entered into an exclusive license agreement on December 5, 2015. The contract granted Heron an exclusive license to use certain trademarks owned by Palace Holdings in the United States for the purpose of marketing and promoting the eight resort properties listed above. The licensing agreement also granted Heron the exclusive right to enforce and protect the trademarks from dilution and infringement in the United States. On February 1, 2016, Palace Holdings assigned the trademarks as well as the licensing agreement with Heron to Palace Resorts.

### 3. *Defendants*

#### a.     Vacation Tours, Inc. ("Vacation Store")

Vacation Tours, Inc.—which operates as "Vacation Store of Miami" and "Vacation Store"—is a Florida Corporation with its principal place of business in Coral Gables, Florida. For a period of time, Vacation Store maintained a wholesaler relationship with Palace Holdings.

#### b.     Media Insight Group

Media Insight Group, Inc. is a Florida Corporation with its principal place of business in Miami Beach, Florida. It is the registrant of forty domain names that allegedly infringe Palace Resorts' trademarks.

#### c.     George A. Alvarez

George A. Alvarez is the registered agent and officer/director of Media Insight.

### d. Rosanna M. Mendez

Rosanna M. Mendez is an officer/director of Media Insight and Vacation Store.

## B. Summary of Facts

Around 2008, Defendants began a marketing, advertising, and reservation referral service. Reservation referral services often have multiple wholesaler commission-based business relationships with hotels, resorts, and other travel-service providers. For every referral-service customer who ultimately purchases a vacation package or books the hotel, the referral service receives a commission payment.

On June 10, 2012, Vacation Store and Palace Holdings entered into the most recent wholesaler contract and addendum ("Final Contract") that specified rates and terms for booking rooms at properties owned and operated by Palace Resorts. The Final Contract prohibited the unauthorized use or reproduction of Palace Holdings' trademarks and listed infringement—including the use of confusingly similar domain names—as grounds for terminating the Final Contract.

At some point, Media Insight began registering the 40 domain names listed in the chart below, all of which include the exact name, or a slight variation, of a Palace Resorts property.[1] Vacation Store uses Media Insight's domain names to operate live websites—designed to resemble authentic Palace Resorts websites—to market its reservation referral business and sell travel services to consumers. Notably, Vacation Store sells reservations at Palace Resorts properties through these domain names without any authorization from, or affiliation with, Palace Resorts.

The following chart lists the thirteen trademarks at issue, their registration and incontestability information, and the infringing domain names registered and used by Defendants to market and sell travel products and services.

| Palace Resort Corporation's Trademarks | Registration & Incontestability | Defendant's Allegedly Infringing Domain Names |
|---|---|---|

---

[1] Media Insight is still the registrant for these domain names.

| | | |
|---|---|---|
| 1. **BEACH PALACE** | Reg. no. 3622187, (Registered on May 19, 2009) (Incontestable on May 19, 2015) | 1. beachpalacecancunhotel.com<br>2. beachpalacecancunresort.com<br>3. beachpalace.tv<br>4. beachpalacegrand.com |
| 2. **COZUMEL PALACE** | Reg. no. 3154935, (Registered on Oct. 10, 2006) (Incontestable on Oct. 21, 2011) | 5. palacecancunhotel.com<br>6. palacecozumel.com |
| 3. **ISLA MUJERES PALACE** | Reg. no. 3611002, (Registered on Apr. 28, 2009) (Incontestable on May 20, 2015) | 7. islamujerespalace.com<br>8. islamujerespalacegrand.com<br>9. palaceislamujeres.com<br>10. islamujerespalaceresort.com |
| 4. **LE BLANC BED** | Reg. no. 3790516, (Registered on May 18, 2010), (Incontestable on May 16, 2010) | 11. leblanc-cancun.com<br>12. leblanc-hotel.com |
| 5. **LE BLANC SPA RESORT** | Reg. no. 3160152, (Registered on Oct. 17, 2006) (Incontestable on Nov. 29, 2011) | 13. leblancancunspa.com<br>14. leblanccancunresort.com<br>15. leblancresortspa.com |
| 6. **MOON PALACE** | Reg. no. 2453148, (Registered on May 22, 2001), (Incontestable on May 18, 2007) | 16. moonpalacecancunresort.com<br>17. moonpalacepuntacanahotel.com<br>18. moonpalaceresortpuntacana.com<br>19. moonpalacepuntacanaresort.com<br>20. moonpalacejamaicagrand.com<br>21. moonpalacejamaicaresort.com<br>22. moonpalaceochorios.com<br>23. moonpalacerivieramaya.com |
| 7. **MOON PALACE GOLF & SPA RESORT** | Reg. no. 3611003, (Registered on Apr. 28, 2009), (Incontestable on May 19, 2015) | |
| 8. **MOON SPA & GOLF CLUB** | Reg. no. 3611001, (Registered on Apr. 28, 2009), (Incontestable on May 22, 2015) | |
| 9. **PALACE RESORTS** | Reg. no. 3738725, (Registered on Jan. 19, 2010), (Incontestable on Jan. 19, 2016) | 24. palacejamaicagrande.com<br>25. palaceresortsguide.com<br>26. xpu-hapalaceresort.com |
| 10. **PLAYACAR PALACE** | Reg. no. 3163633, (Registered on Oct. 24, 2006), (Incontestable on Oct. 24, 2011) | 27. palaceplayacar.com<br>28. playacarpalace.com<br>29. playacarpalacegrand.com<br>30. playacarpalaceresort.com<br>31. palaceplayacarresort.com |
| 11. **SUN PALACE** | Reg. no. 3622188, (Registered on May 19, 2009), (Incontestable as of May 19, 2015) | 32. sunpalacecancunresort.com<br>33. sunpalaceresort.com<br>34. sunpalace.tv |

| 12. CANCUN PALACE | Serial no. 86659415 | 35. palacecancunresort.com<br>36. cancunandbeachpalace.com<br>37. cancunpalace.tv |
|---|---|---|
| 13. CANCUN PALACE | Serial no. 86656713 | 38. cancunpalacelasamericas.com<br>39. cancunpalacespecials.com<br>40. palacecancun.com |

On March 14, 2014 Palace Holdings' lawyer sent a letter to Vacation Store and Rosanna Mendez terminating the Final Contract because of Vacation Store's use of the infringing domain names. According to Palace Holdings, the use of these domain names violated the Final Contract's intellectual property restrictions. Five days later, Palace Holdings' lawyer sent a second letter demanding that Vacation Store cease and desist using Palace Holdings' protected marks.

Vacation Store did not comply with Palace Holdings' requests. Rather, it responded on April 1, 2014 by sending Palace Holdings a proposed domain names license agreement. The proposed agreement sought payment from Palace Holdings in exchange for transferring the challenged domain names, or permitting the company to use those domain names. Palace Holdings declined.

Palace Holdings' counsel sent Mendez and Alvarez, as representatives of Vacation Store and Media Insight, a final cease and desist letter on June 15, 2015. This letter cited Defendants' intellectual property infringements and detailed seven instances of actual customer confusion resulting from Defendants' use of the domain names at issue. Defendants refused to comply. On February 1, 2016, Palace Holdings assigned "all of its rights, interests, and obligations in and to the Palace Resort Marks and the License Agreement" to Palace Resorts. (Second Am. Compl. ¶ 22.) The assignment also transferred the licensing agreement with Heron to Palace Resorts.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is authorized where there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157

(1970). The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential elements of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The non-movant must present more than a scintilla of evidence in support of the non-movant's position. A jury must be able reasonably to find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

## B.   Violation of the Anti-Cybersquatting Consumer Protection Act

Palace Resorts contends that it is entitled to summary judgment on its claim against Defendants for violations of the Anti-Cybersquatting Consumer Protection Act ("Anti-Cybersquatting Act"). *See* 15 U.S.C. § 1125(d). Defendants offer several arguments to rebut Palace Resorts' position. First, Defendants argue that Palace Resorts lacks standing to bring a claim under the Anti-Cybersquatting Act. Second, Defendants contend that Palace Resorts fails to establish the elements of a cybersquatting claim. Finally, they offer affirmative defenses of genericness, fair use, acquiescence, laches, and prior use. All of Defendants' rebuttals fail.

### 1.   Palace Resorts' Standing Under the Anti-Cybersquatting Act

Defendants contend that Palace Resorts lacks standing for four reasons. First, Defendants challenge Palace Resorts' ownership of the marks. Second, Defendants suggest that the license agreement between Heron and Palace Resorts is a "naked license." Third, Defendants contend that the assignment of the marks was an invalid "assignment in gross." Finally, Defendants argue that Palace Resorts has abandoned the marks by failing to use them in commerce.

#### a.   Palace Resorts' Ownership of the Marks

First, Defendants contend that Palace Resorts does not own four of the thirteen marks at issue: (i) LE BLANC SPA RESORT; (ii) LE BLANC BED; (iii) MOON SPA & GOLF CLUB; and (iv) PALACE RESORTS. However, Palace Resorts has provided Trademark Status and Document Retrieval reports from the United States Patent and Trade Office database showing

7

their ownership of all thirteen marks, including the four marks specifically challenged by Defendants. (*See* D.E. 170-1.) Because Defendants have provided no evidence to the contrary, Palace Resorts has carried its burden of establishing ownership.

### b. Naked License

Second, Defendants argue that Palace Resorts lacks standing because the exclusive license agreement between Heron and Palace Resorts Corporation "fails to contain quality control provisions, which means it is a 'naked license,' and therefore invalid as a matter of law." (Resp. at 8.) Defendants contend that the "naked license" resulted in an abandonment of the marks.

"A trademark or service mark can be validly licensed to another to use but only if the licensor exercises control over the nature and quality of the goods and/or services sold by the licensee under the licensed mark." 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:38 (5th ed. 2017). "If the licensor fails to fulfill this duty, it may lose some or all rights in the mark." *Id.*

Discussing the policy behind this control requirement, the Eleventh Circuit explained that "[b]y requiring a licensor to supervise a licensee's use of its own mark and to some extent a licensee's operations under that mark, the law attempts to ensure that the public will not be deceived when purchasing goods and services that relate to that trademark." *Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1519 (11th Cir. 1992). This supervision requirement "exists to protect the public from being misled about the quality or consistency of the products offered under the licensors' trademark." *Id.*

Defendants contend that Palace Resorts failed to satisfy its control requirement because the exclusive license agreement grants "to [Heron] the exclusive rights to enforce the trademarks against infringement[.]" (Resp. at 8.) In other words, Defendants argue that the contract granted Heron—and only Heron—the right to sue for trademark infringement, and that because Palace Resorts could not sue trademark infringers without first obtaining Heron's authorization, Palace

8

Resorts surrendered too much control to satisfy the supervision mandate. However, given that the present case arises out of Palace Resorts and Heron's attempt to prevent, and recover for, trademark infringement, Defendants' argument misses its mark.

Furthermore, Heron uses Palace Resorts' trademarks (with Palace Resorts' authorization) to market and sell the very same products and services Palace Resorts uses the trademarks to market and sell. Thus, there is no risk that the public will be "unwittingly deceived" about the "quality or consistency of the products offered under the licensor's trademark." *Mini Maid Servs. Co.*, 967 F.2d at 1519 (citing *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959)). Accordingly, Defendants' "naked license" argument fails to defeat Palace Resorts' standing.

### c.   Assignment in Gross

Third, Defendants argue that Palace Holdings' assignment of the thirteen trademarks to Palace Resorts constituted an invalid assignment in gross because it did not assign the marks together with the goodwill of the business symbolized by the marks. According to Defendants, this alleged assignment in gross resulted in an abandonment of the thirteen marks and vitiates Palace Resorts' standing.

At common law and under the § 10 of The Lanham Act, "[t]he basic rule of trademark assignments is that a trademark cannot be assigned to another separate from the goodwill associated with the mark." 3 *McCarthy on Trademarks and Unfair Competition* § 18:2. In the Eleventh Circuit, "it is well-settled law that 'the transfer of a trademark or trade name without the attendant good-will of the business which it represents is, in general, an invalid, 'in gross' transfer of rights.'" *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002) (quoting *Berni v. Int'l Gourmet Rest. of Am.*, 838 F.2d 642, 646 (2d Cir. 1988)).

Like the rule against naked licenses, the anti-assignment-in-gross rule aims to prevent consumer deception caused when an assignee alters the quality of goods under the same mark. *In*

*re XMH Corp.*, 647 F.3d 690, 696 (7th Cir. 2011). "Use of the mark by the assignee in connection with a different goodwill and different product may result in a fraud on the purchasing public, who reasonably assume that the mark signifies the same nature and quality of goods or services, whether used by one person or another." 3 *McCarthy on Trademarks and Unfair Competition* § 18:3.

Defendant contends that the assignment from Palace Holdings to Palace Resorts constituted an invalid assignment in gross because the assignment agreement lacked "any indication of assignment of goodwill or assets." (Resp. at 10.) Indeed, some courts have required trademark assignment agreements to satisfy certain technical requirements—namely, that the assignment agreement include a provision stating that the assignment transfers both the goodwill and the trademarks. And as Defendant correctly notes, "there is nothing in the January 15, 2016 amendment to the original license agreement that would indicate that there was an assignment of goodwill or assets." (*Id.*)

However, rather than rigidly apply the anti-assignment-in-gross rule, most courts now hold that the rule simply "require[s] the seller and purchaser to attempt to ensure the accuracy of the implied representation of continuity of the seller's quality control by taking steps to ensure that some facsimile of the seller's quality control remains in place through the closing and for some indefinite period thereafter." 3 *McCarthy on Trademarks and Unfair Competition* § 18:3. "The rule is not . . . intended to be a mechanistic tool for invalidating assignments which do not satisfy a stereo-typed set of formalities . . . . [T]he test is simply whether the transaction is such that the assignee can 'go on in real continuity with the past.'" *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1350 (E.D.N.Y. 1994) (assignment of the "Dial-A-Mattress" trade name to a corporation that was already using the name was not an invalid assignment in gross where the assignee had already built up substantial goodwill in the name before assignment and assignor had no assets other than its intellectual property at the time of assignment); *see also Fitzpatrick v. Sony-BMG Music Entm't, Inc.*, No. 07 CIV. 2933 SAS, 2010 WL 3377500, at *3 (S.D.N.Y. Aug. 24, 2010) (holding that the assignment was not in gross

10

where the assignee used the trademark to distribute records with the "same distinctive trade style" used by the assignor). Most importantly, the Eleventh Circuit has embraced this common-sense application of the assignment-in-gross rule. *See Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002) ("[T]he assignment was not in gross because it continued the association of the [] trademark with the very goods which created its reputation.").

As discussed, Palace Resorts uses the assigned trademarks to market and sell the very same travel products and services Palace Holdings used the trademarks to market and sell before the assignment. Thus, the challenged assignment presents no risk of deceiving the public about the "quality or consistency of the products offered under the licensor's trademark." *Dial-A-Mattress Operating Corp.*, 841 F. Supp. at 1350; *see also Purity Cheese Co. v. Frank Ryser Co.*, 153 F.2d 88, 90 (7th Cir. 1946) ("A trade-mark may be assigned, licensed, or lent, as long as it remains associated with the same product or business with which it has become associated in the public mind . . . ."). Therefore, the challenged assignment is enforceable and Palace Resorts has standing to sue for violations of the Anti-Cybersquatting Act.

### d.    Abandonment

Finally, Defendants contend that Palace Resorts lacks standing in this case because it "does not use the mark[s] in commerce" and has therefore abandoned the marks at issue. (Resp. at 13.) Specifically, Defendants suggest that Palace Resorts' failure to have an office in the United States, and provide services in the United States, constitutes abandonment of the mark[s.]" *Id.* This argument lacks merit.

"Defendants asserting an abandonment defense bear a strict burden of proving abandonment by a preponderance of the evidence." *Edge Sys. LLC v. Aguila*, 186 F. Supp. 3d 1330, 1347–48 (S.D. Fla. 2016), *aff'd*, 708 F. App'x 998 (Fed. Cir. 2017); *see also Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1173 (11th Cir.2002) ("[F]ederal courts uniformly agree that defendants asserting an abandonment defense face a 'stringent,'

'heavy,' or 'strict burden of proof.'"). To carry this burden, Defendants must establish that Palace Resorts discontinued its use of the marks at issue "with intent not to resume such use." 15 U.S.C. § 1127.

Defendants do not indicate when Palace Resorts allegedly abandoned the marks, nor do they offer any evidence that Palace Resorts stopped using the marks with the intent that such discontinuation be permanent. Furthermore, Defendants incorrectly assert that Palace Resorts does not use the relevant trademarks "in commerce" because it lacks an office in the United States and sells and markets services affiliated only with hotels outside the United States.

The "use in commerce" requirement is satisfied where the mark is "used or displayed in the sale or advertising of the service within the United States" and "the service rendered [is] within the scope of activity Congress may regulate under the Commerce Clause." *BD Real Hoteles, S.A. de C.V. v. Vacation Tours, Inc.*, No. 08-20112-CIV, 2009 WL 10668495, at \*4 (S.D. Fla. Nov. 12, 2009); *see also Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 365 (4th Cir. 2003) ("Since the nineteenth century, it has been well established that the Commerce Clause reaches to foreign trade. And, for the same length of time, the Supreme Court has defined foreign trade as trade between subjects of the United States and subjects of a foreign nation."). Palace Resorts and its licensees satisfy the "use in commerce" requirement by using the marks to advertise and sell hotel services to U.S. customers over the internet. Palace Resorts displays the marks on websites specifically targeting audiences in the United States, and includes the marks in emails and surveys sent to U.S. customers. Notably, U.S. customers book 64% of reservations at Palace Resorts hotels.

In short, Palace Resorts has clearly established its use of the marks in the type of commerce Congress may regulate. Defendants have provided no evidence to suggest that Palace Resorts has discontinued such use. Accordingly, Defendants' abandonment claim offers no defense against summary judgment.

## 2. *Palace Resorts' Anti-Cybersquatting Claim*

The Anti-Cybersquatting Act "creates civil liability for the cybersquatting of any mark ("famous" or not)." 5 *McCarthy on Trademarks and Unfair Competition* § 25A:50 (citing 15 U.S.C. § 1125(d)). To establish a cybersquatting claim, Palace Resorts must "plead . . . the following four elements: (1) [t]he defendant has registered, trafficked in or used a domain name; (2) [w]hich is identical or confusingly similar to a mark owned by the plaintiff; (3) [t]he mark was distinctive at the time of the defendant's registration of the domain name; and (4) [t]he defendant has committed the acts with a bad faith intent to profit from the plaintiff's mark." *Id.* Palace Resorts has provided evidence to establish each of these elements.

### a. "Registered, Trafficked In, or Used a Domain Name"

First, Media Insight registered 40 domain names strikingly similar to Palace Resorts' trademarks. The evidence indicates that George Alvarez and Rosanna Mendez use Media Insight—an entity with no assets—to register and own domain names on behalf of Vacation Store. Alvarez and Mendez then use the Media Insight domain names to sell travel services for Vacation Store by operating websites that display Palace Resorts' trademarks and copyright-protected content, and resemble authentic Palace Resorts websites. Accordingly, the record demonstrates that Defendants "registered, trafficked in or used" the domain names at issue.

Defendants contend that Palace Resorts can recover only from the "domain name registrant or that registrant's authorized licensee," 15 U.S.C. 1125(d)(1)(D), and thus, cannot prevail against Vacation Store, Alvarez, or Mendez. This argument is futile.

Media Insight—the listed registrant for each of the 40 infringing domain names—has no assets and, indeed, no purpose aside from registering domain names for the benefit of Vacation Store. Thus, awarding summary judgment against only Media Insight, but not Vacation Store, Alvarez, or Mendez, would be a hollow, worthless victory for Palace Resorts.

Indeed, Defendants' mechanical interpretation of the Anti-Cybersquatting Act would turn the law on its head, empowering the very conduct it seeks to prevent by insulating cybersquatters from liability where, as here, they register infringing domain names using a shell entity. Alvarez

has admitted under oath that he uses Media Insight only to register domain names for the benefit of Vacation Store's commercial activity. Furthermore, Vacation Store, Alvarez, and Mendez previously tried to license or sell the infringing domain names to Palace Holdings. Having exerted this authority and control over the domain names, Vacation Store, Alvarez, and Mendez cannot disclaim their connection to avoid liability. At minimum, Vacation Store, Alvarez, and Mendez qualify as authorized licensees or agents of Media Insight such that Palace Resorts can recover from any of the named Defendants for violations of the Anti-Cybersquatting Act.

b.    "Identical or Confusingly Similar to a Mark Owned by the Plaintiff"

Second, Defendants' domain names are "identical or confusingly similar" to the Palace Resorts trademarks. *Id.* "In the cybersquatting context, 'confusingly similar' means that the plaintiff's mark and the defendant's domain name are so similar in sight, sound or meaning that confusion is likely." *Id.* In this case, Defendants' domain names incorporate Palace Resorts' trademarks exactly, or at the very least, in a confusingly similar manner. *See* Section II.B, *supra* at 5–6 (listing Defendants' domain names alongside Plaintiffs' trademarks); *see also DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 206 (6th Cir. 2004) (holding that the domain name "foradodge.com" was confusingly similar to the trademark DODGE in the context of automobiles). Palace Resorts and Defendants operate in the travel industry and maintain an online presence to sell travel products and services, making customer confusion more likely. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 976 (11th Cir. 1983) ("The greater the similarity between the products and services, the greater the likelihood of confusion.") (quotations omitted). Additionally, Palace Resorts and the Defendants both utilize the internet as a marketing channel, which also increases the likelihood of customer confusion. *See Turner Greenberg Assocs.*, 320 F. Supp. 2d at 1332 (noting that convergent marketing channels increase the likelihood of confusion). Finally, Palace Resorts has provided multiple instances of *actual* customer confusion where the customer believed he booked his reservation through Palace Resorts' website, when in fact he booked his reservation through Defendants' website on one of

the challenged domain names. Therefore, Palace Resorts has satisfied the "confusingly similar" requirement.

### c. "Distinctive at the Time of Defendant's Registration of the Domain Name"

Third, the Palace Resorts marks qualified as distinctive when Defendants registered and used the infringing domain names. All but two of the thirteen marks at issue are incontestable, which establishes the presumption of validity—*i.e.*, that the marks are distinctive and "cannot be challenged on the grounds that [they are] merely descriptive." *Dieter v. B & H Indus. of Sw. Florida, Inc.*, 880 F.2d 322, 328 (11th Cir. 1989).

For the two unregistered trademarks—both comprised solely of the combined term "CANCUN PALACE"—Palace Resorts claims that Palace Holdings began using these marks in commerce in December 2015, and has filed an application to register the marks with the United States Patent and Trademark Office. Both marks are associated with the Cancun Palace Hotel and Spa—a specific property owned by Palace Resorts. Because Palace Resorts uses the "CANCUN PALACE" marks to denote a hotel and spa—rather than an actual palace located in Cancun—the marks "suggest characteristics of the goods and services and 'require an effort of the imagination by the consumer in order to be understood as descriptive.'" *Id.* Therefore, both "CANCUN PALACE" marks are "suggestive"—and, in turn, "distinctive"—rather than merely "descriptive." *Id.* Finally, because Defendants fail to specify the date they registered the domain names that allegedly infringe the "CANCUN PALACE" marks, the Court presumes that Palace Holdings' use of the suggestive marks in 2015 predated Defendants' domain name registration such that, as Palace Holdings' successor in interest, Palace Resorts has priority rights in the marks. Accordingly, Palace Resorts has established that the thirteen trademarks were distinctive when Defendants registered the challenged domain names.

### d. "Bad Faith Intent to Profit From Plaintiff's Mark"

Fourth, the evidence overwhelmingly indicates that Defendants registered and used these domain names with a bad-faith intent to profit off of Palace Resorts' trademarks and

corresponding goodwill. The Anti-Cybersquatting Act establishes nine factors to consider when determining whether a domain name has been registered or used in "bad faith" with the intent to profit from a mark. Those factors are:

(1) Whether the defendant has trademark or other intellectual property rights in the domain name;

(2) Whether the domain name refers to the legal name of the defendant;

(3) Whether the defendant ever used the domain name in connection with the bona fide offering of any goods or services;

(4) Whether the defendant has a bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(5) Whether the defendant has an intent to divert consumers from the mark owner's website to his own, either for commercial gain or with the intent to tarnish or disparage the mark, when that diversion could cause harm to the mark owner's goodwill;

(6) Whether the defendant offers to transfer or sell the domain name for financial gain when he has not used or had an intent to use the domain name in connection with the bona fide offering of any goods or services;

(7) Whether the defendant provides material and misleading false contact information when applying for the registration of the domain name or the defendant intentionally fails to maintain accurate contact information;

(8) Whether the defendant acquired multiple domain names that the defendant knows are identical or confusingly similar to distinctive marks; and

(9) Whether the mark is distinctive or famous.

*Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 776 (11th Cir. 2015) (quoting 15 U.S.C. § 1125(d)(1)(B) (quotations omitted)).

In this case, the evidence illustrates Defendants' bad-faith intent to profit from Palace Resorts' trademarks. First, Palace Resorts alleges that Defendants have no intellectual property rights in Palace Resorts' trademarks, but still incorporated those marks in their registered domain names. Second, none of the infringing domain names consist of the legal name of any of the Defendants. Third, Defendants use the domain names in commerce to divert web traffic and profits from Palace Resorts. Fourth, given the cease and desist letters sent to Defendants in response to their infringing use, and Defendants' efforts to mimic the appearance of authentic Palace Resorts websites, it is clear that Defendants registered and used the domain names with knowledge that doing so would harm Palace Resorts and the value of its trademarks. Fifth, after receiving multiple cease and desist letters, Defendants sent Palace Holdings a domain names license agreement seeking payment from Palace Holdings for a transfer or use of the infringing domain names. Sixth, Defendants registered at least forty domain names that were intentionally identical or confusingly similar to Palace Resorts' distinctive marks. Accordingly, Palace Resorts has shown that Defendants acted in bad faith as defined by the Anti-Cybersquatting Act.

Accordingly, Palace resorts has satisfied all four elements of a cybersquatting claim against Media Insight, Vacation Store, George Alvarez, and Rosanna Mendez.

## C. **Defendant's Affirmative Defenses**

In a final attempt to avoid summary judgment, Defendants raise (again) defenses that this Court has already rejected: (i) genericness; (ii) fair use; (iii) acquiescence; (iv) laches; and (v) prior use. Magistrate Judge John J. O'Sullivan thoroughly addressed and dismissed each of these affirmative defenses in his Report and Recommendation on Plaintiffs' Motion for Preliminary Injunction, which this Court adopted. (D.E. 94 at 17–32.) Defendants have offered no evidence to alter Judge O'Sullivan's analysis or his conclusions, so this Court need not explain for a second time why Defendants' defenses lack merit. Because Judge O'Sullivan's determinations apply with equal force today, Defendants' affirmative defenses fail.

## III. CONCLUSION

For the reasons stated above, Palace Resorts' motion for summary judgment on Count I (violations of the Anti-Cybersquatting Act) is GRANTED.

DONE AND ORDERED in Chambers at Miami, Florida, this ____ of June 2018.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record